UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA  DIVISION

MID-DELTA, et al                    CIVIL ACTION NO. 06-2173
                                    (CONSENT)
VERSUS

PROFESSIONAL TRENDS, et al          MAGISTRATE JUDGE KIRK

MEMORANDUM RULING

The liability issues in this case were tried before me by consent of the parties  December 16th and 21st, 2009. This is a suit for breach of contract regarding a buy-sell agreement dated August 9, 2006 and of a consulting agreement. Both contracts direct that Mississippi law applies to their interpretation.

Background Facts

The following facts have been stipulated by the parties or have been found by me to be true based on the evidence at trial.

Professional Trends, Inc. (Professional Trends) is a Louisiana corporation which was incorporated in July 2005. It is a home health medical provider operating under Louisiana license number 410. A prior corporation by the same name and operating under the same license, incorporated in 1991, but with a different tax identification number, was dissolved and "reincorporated" as the present company. The principal owner (shareholder) is defendant Brenda Sanders Wilcox (Wilcox) who serves as president. The company

1

was always managed by others, including a management company, United Home Care, Inc. (United Inc.), owned by three persons, Steven Anthony Privitor,  Darrell Glen Newman and John Daniel Jones. Most, if not all of the revenues of the company come from billing Medicare.

About the time of the 2005 incorporation, Wilcox, on behalf of Professional Trends, Inc.  entered into a loan agreement with United Inc. to borrow money.[1]  At the same time, Professional Trends borrowed $75,000 from Ouachita Independent Bank.

At the same time, Wilcox  began the process of changing Professional Trends' name to United Home Care V, Inc. (United V) by amending the Articles of Incorporation. Wilcox then sold shares in United V to Privitor (833 shares), Jones (833 shares), and Newman (834 shares), in exchange for $25,000 each. Their checks were made payable to Professional Trends, not United V. Debbie Mullenix then bought 1,000 shares. Wilcox was named President, Privitor Secretary, and Mullenix Treasurer. A Form CMS 855A was filed with the Louisiana Department of Health and Hospitals (DHH), which

---

[1]  July 5, 2006 "Minutes of the Meeting of the Board of Directors of Professional Trends, Inc." states that "a meeting of the Board of Directors and Shareholders of United Home Care  was held" and authorized Wilcox to enter into a loan agreement with United Home Care, Inc. for the uses of Professional Trends. This is but an example of the fact that the names Professional Trends and United Home Care V., Inc. were used interchangeably. The actual Loan Agreement and Promissory Note is in the name Professional Trends. The July 5th minutes are dated a week before the Articles were amended to change the name of the company to United Home Care V, Inc.

2

oversees home health agencies in Louisiana, listing Wilcox, Privitor, Newman, and Jones as owners. No incorporation papers have ever been filed with the Louisiana Secretary of State formally incorporating United V, nor was Professional Trends dissolved. The company continued to operate as Professional Trends.

United V also entered into a consulting agreement with United Inc.

I find that Professional Trends and United V are one and the same company.

In December 2005, Privitor wrote a letter to Wilcox resigning "as Secretary of Professional Trends, Inc., d/b/a United Home Care V, Inc." Privitor also advised that he would no longer be working for her consulting management company, United Inc. He also pointed out that state and federal employment taxes had never been paid.

In early 2006 Wilcox was in Houston buying a house near her daughter and convinced her realtor, Eija Watson, to loan Wilcox money as an investment in Professional Trends. Watson loaned Professional Trends and Wilcox a total of $75,000 between March and May of 2006. The company had financial "problems" as early as October, 2005 and as of February 2006, no Medicare billing had ever been done and it thus had no income.

In addition, even though Wilcox had not repaid the $75,000 loan from Watson, Wilcox advised Watson that there was an opportunity for her to purchase an interest in the company. In

3

April 2006, Watson entered into an agreement with Wesley Steele and Shirley Edwards to purchase their interests in Professional Trends for $75,000.

In financial straights, and without adequate money to run Professional Trends, Wilcox decided to sell the company in August 2006. Her reasons for selling were several.

First, on August 3, 2006, the State of Louisiana Department of Health and Hospitals (DHH) had performed a review of the company, as it periodically does for all such companies to be sure they are in compliance with applicable federal and state regulations and policies. Numerous deficiencies were found.[2] DHH gave Professional Trends only 10 days within which to submit a corrective action plan to correct the deficiencies. Because the management company, United Home Care, Inc., owned by Privitor, Newman and Jones, had backed out of its contract to manage Professional Trends as of August 6, 2006, and Wilcox was not a registered nurse and was not experienced in the day to day operations of the business[3], she was unable to correct the deficiencies and therefore risked losing her license. Privitor had not been involved since October 2005 and had resigned his activities with both Professional Trends and the management company

---

[2] The list of deficiencies sent by DHH on August 15, 2009 totaled 49 pages.

[3] Wilcox did not supervise employees, conduct billing, provide patient care, or manage payroll and accounting.

4

as of December 27, 2005.

Second, at the time, the company was heavily in debt and bills were not being paid, including rent and utilities. Employees were owed money for wages. Wilcox had limited operating capital, insufficient staff to correct the problems, and personal health problems.

Wilcox told Tonette Mix, an employee of Mid-Delta Health Systems, Inc. (Mid-Delta)  that she wanted to sell the business. Wilcox was asked by Mix if she would be interested in meeting with Clara Reed, owner of Mid-Delta. Mid-Delta is a Mississippi company owned by Henry and Clara Reed that has been in the home health business since 1978. Reed is a registered nurse with a BA in gerontology and personally operates the company as CEO. Wilcox agreed to meet with Reed and, on August 9, 2006 the two met at Wilcox's office in Vidalia, Louisiana. Reed expressed interest in buying the business, including the license.[4]

The two agreed on a price of $450,000. Reed phoned her in-house attorney in Mississippi, VP for legal affairs, Jake Kilburn, and told him she needed a buy-sell agreement within 30 minutes. Reed and Wilcox discussed the proposed sale, and Wilcox told Reed that she was the sole owner of the company. She also advised Reed

---

[4]  In Louisiana the permission from the state to do business as a home health agency is a license, akin to a "certificate of need" in Mississippi and some other states . A home health care license is very valuable because the state has placed a moratorium on the issuance of new licenses.

5

there was an outstanding debt of the company to Ouachita Independent Bank in the amount of $75,000. Reed agreed to increase the purchase price to $525,000 in order to provide Wilcox funds to pay off that debt. Wilcox also advised Reed that approximately $9,000 was owed for certain debts, including rent, utilities, phone and salaries. Reed agreed to advance that amount, to be deducted from the purchase price.  Wilcox told Reed there were no other debts except a debt to the IRS which, she told Reed, was offset by money the IRS owed her.

After additional discussions, and drafts of the agreements being faxed back and forth from Kilburn to Reed and Wilcox, and after Wilcox had her attorney review it, the buy-sell agreement was signed the same day by both parties, Wilcox and Reed.  Reed gave Wilcox a personal check for $50,000 as a deposit.[5]  The contract provided that the sale would include all assets, provider numbers, license #410, certificates of need,[6] goodwill, trade names, furniture, fixtures and equipment. The agreement required Professional Trends to convey good, clear and marketable title and to sell the assets free and clear of all liens and encumbrances. The agreement  provides that it is seller's responsibility to clear

---

[5]  Wilcox held the check for several weeks because she "didn't want to lose it" and then gave it to her attorney, Paul Breaux, who deposited it in his trust account, disbursing it to Wilcox by checks and money orders. Wilcox says she doesn't remember why she wanted it disbursed in such manner.

[6] See FN 4, supra, at page 5.

6

all of the encumbrances.[7]  It was agreed that the closing of the sale would take place on September 30, 2006.

In the same meeting on August 9th, the parties also agreed that Mid-Delta would immediately take over the day-to-day operations of the business pending the closing and would receive as remuneration all of the accounts receivable generated during that time period.[8] All accounts receivable prior to August 1, 2006 would belong to Professional Trends.[9]  A limited power of attorney was signed so Mid-Delta could operate the business.

On August 9th, Mid-Delta began operating the Professional Trends business.[10]  Wilcox had told Reed there were 42 to 44 patients; in fact there were only 22 patients.

After the meeting, Wilcox contacted Newman to see what he, Privitor, and Jones wanted out of the sale. She also contacted

---

[7]  Although the contract states that buyer would pay the $75,000 debt to Ouachita Independent Bank, the parties agree that the agreement was in fact that Wilcox would pay it with the increased purchase price of the business. Kilburn explained that the provision that Reed wold pay it was inadvertently left in the agreement from an earlier draft, before the parties agreed to increase the price from $450,000 to $525,000 to cover that debt.

[8]  Wilcox says only to Sept 30, 2009, the date of the closing.

[9]  The date was made August 1st instead of August 9th in order to avoid unnecessary bookkeeping problems.

[10]  Within a week of signing the agreement to sell the business, Wilcox relocated to Spring Texas, near Houston, for about a year, and then moved to Slidell, La.

Watson about the proposed sale. Suit was filed by Ouachita Independent Bank for collection of the $75,000 loan  and a judgment was taken in September 2006.

After the contract was signed, Mid-Delta's attorney, Kilburn, contacted DHH with regard to curing the deficiencies. He also began what he calls "due diligence" with regard to the deal. Kilburn met with Marion Tate with DHH, who advised him that a written document was needed by the state to show that Mid-Delta had legal authority to operate Professional Trends. Therefore, on August 28, 2006, the parties entered into a written consulting agreement so that Mid-Delta could operate the business and cure the deficiencies noted by the DHH which had put the license in jeopardy.

Mid-Delta then timely cured the deficiencies the State had noted with regard to the license.

However, in Kilburn's meeting with Ms. Tate, she showed him a CMS 855A form which showed that there were three additional owners of Professional Trends listed--Steven Anthony Privitor, Darrell Newman, and Danny Jones. The  form contained Wilcox's signature and was dated July 2005.  This caused Kilburn concern because Wilcox had told Reed she was the only owner of Professional Trends.

After the agreement was signed, Mid-Delta was contacted by individuals and vendors of Professional Trends who asserted claims against Professional Trends and who claimed ownership interests. Kilburn also received a phone call from one of the listed "owners,"

8

Newman, and Kilburn met the three-Privitor, Newman, and Jones-in Monroe to discuss their claims. At that time he was provided with documents, including board minutes from Professional Trends, which showed that the name Professional Trends had been changed to United Home Care V, Inc.[11] and the three were indeed owners just as had been reflected on the Form 855A that DHH had shown Kilburn. Each had invested $25,000 and each was issued 8.33% of the shares of United V.

Kilburn also looked at public records in Vidalia and saw the tax lien filed against Professional Trends for past due 1996 and 1998 taxes and that Ouachita Independent Bank had filed suit on its $75,000 loan.  He was also advised that past due employee wages were owed, and other debts were past due, including utility bills, a bill for office furniture and a bill from a medical supplier. He was also contacted by Eija Watson who told him she had loaned $75,000 to  the company and, in addition, had purchased a 25% interest in the company from  Wesley Steele and Shirley Edwards for $75,000.[12]

In late August, Wilcox hired Lafayette attorney Paul Breaux to represent her in the sale transaction.

---

[11]     This is not the same company as United Home Care, Inc., although some of the principals are the same, namely Privitor, Jones and Newman.

[12]  Unlike the other persons who claim an interest in the company, neither Watson's nor Mullenix's names appear on the 855 or in the board minutes or elsewhere.

Kilburn advised Breaux of these problems by email, letter and phone as they came up. Breaux forwarded the emails, letters and the substance of the phone calls to Wilcox as he received them. Wilcox admitted that she knew Breaux had been told of these. While Breaux responded politely to Kilburn, he did not indicate that he was doing or would do anything to clear the encumbrances of which Kilburn had learned. Despite the documents, including the 855 form and the board minutes showing the existence of other owners, Breaux referred to the other owners' claims as "allegations," pointing out that Wilcox had given Mid-Delta her "certification" that there were no additional owners.

Wilcox made no efforts to satisfy Privitor, Jones, Newman, Mullenix, or Watson's claims, or the other debts before Sept. 30, 2006. Satisfying the owners' claims was important to plaintiffs not only because they asserted an ownership interest in the business but also because, since three were listed as owners on Form 855, the state required that they sign any transfer of ownership documents before the state would approve transfer of ownership.

Kilburn also learned that Privitor would relinquish his claim if the Ouachita Independent Bank loan of $75,000 were paid off since Privitor had personally co-signed that loan. Jones advised Kilburn that United Inc. was owed $179,000 by Professional Trends but that he would settle for $100,000 and relinquish that claim.

Kilburn also learned that Newman and Mullenix did not want money for their shares.

The existence of other owners and the name change to United V had not been disclosed by Wilcox in her discussions with Reed, or otherwise. Neither had she disclosed the existence of the other debts and encumbrances that were extant, with the exception of the tax lien, the Ouachita Independent Bank loan, and the $9,000 in debt for utilities and other past due bills.

Because these encumbrances had not been discharged and because new ones, in Kilburn's words, kept "popping up," the parties agreed to put off the closing until October 13, 2006. Kilburn told Breaux that the encumbrances needed to be discharged before the closing on Sept 30th. Breaux insisted that the closing be at his office in Lafayette. In the meantime, Kilburn emailed Breaux repeatedly asking him and his client to clear the encumbrances. Kilburn received no meaningful response except, for the most part, acknowledgments of the correspondence. He was provided no documentation showing any of the problems had been corrected and no assurances that the matters would be taken care of or even that he and/or his client were working toward resolving them.

Wilcox told Breaux not to tell Privitor and the other owners about the closing and not to tell them the price for which she was selling the company.

Kilburn advised Breaux by email on October 2, 2006 that Mid-

11

Delta was prepared to pay off the debts at the closing on the 13th.

Henry Reed, Clara Reed, Kilburn, and Paul Mathis (Reed's outside attorney) drove to Breaux's office in Lafayette on October 13, 2006 at the appointed time, prepared to purchase the business, and expecting that the encumbrances had somehow been cleared up in accordance with the agreement which required seller to do so. At this time, Kilburn knew the debts of Professional Trends included at least the following:

-Ownership claims by Privitor, Newman, Jones, Mullenix and
      Watson,

-Eija Watson debt in the amount of $75,000,

-past due wages to employees of $17,182.09 incurred prior
      to the date of the buy-sell agreement plus employment
   taxes owed on that amount,

-tax lien,[13]

-Ouachita Independent  Bank loan of $75,000,

-$9,039.11 debts for utilities, etc.,

-office supplier bill of $7,000,

---

[13]   Wilcox claims this lien was against the first Professional Trends, Inc. company, not the "reincorporated" Professional Trends involved in this suit and points out that they have different tax ID numbers. However, both companies operated under Louisiana license 410 and, it appears, likely had the same assets. It is unlikely the IRS would have been thwarted by the technicality that the company had been reincorporated. However, it is not the validity of the tax lien that is at issue, it's the fact that the lien, in the name of Professional Trends, Inc., serves as an encumbrance on the company Mid-Delta was buying and needed to be resolved.

-medical supplier,

-claim of United Inc. (Jones) for $179,000, and

-claims for Louisiana unemployment taxes.

In addition, Kilburn had also asked for malpractice insurance information which Mid-Delta's malpractice company needed and which had not been provided. He also knew the workers' compensation policy had been cancelled for non-payment.

Reed, Kilburn, et al.,  took with them checks with which to pay off the encumbrances, the check printing machine, and documents necessary to close the sale. When they arrived, Wilcox was not there, only Breaux.  Kilburn testified that Breaux told them first that Wilcox was on her way from Houston but had car trouble. No documents were produced by Breaux as to the encumbrances. It became clear to Reed, et al., that the encumbrances had not been cleared. Breaux, who had been talking to his client by phone in another room, came back in and said that Wilcox would not be coming to the closing after all.

Kilburn testified Mathis told Breaux that even though the encumbrances had not been resolved, Mid-Delta still wanted to close the deal and suggested holding the money in escrow. Breaux, he said, did not want to "entertain that notion and essentially showed us the door."

After the aborted closing, Kilburn continued to communicate with Breaux and expressed Mid-Delta's continued intent to close the

13

deal. Kilburn and Mathis prepared a letter to Breaux which to some extent summarized what had taken place and again asked that the encumbrances be taken care of and expressed Mid-Delta's intent to purchase the business. Breaux had no further involvement shortly after October 13, 2006.

In the meantime, Mid-Delta continued to operate the business at its sole expense until March 20, 2008. Wilcox testified she was not involved in the operation of business then, didn't pay anything for expenses, and hasn't repaid the expenses that Mid-Delta incurred for operating the business during those 19 months. Reed said she was never advised the deal was off. There were no other communications before filing suit.

Wilcox claims she asked Professional Trends on multiple occasions to leave the business and let her back in. Wilcox never tendered the $50,000 deposit back and never repaid or offered to pay the million or so dollars Kilburn estimates Mid-Delta spent getting the company back on its feet.

<u>The Claims</u>

Mid-Delta and Reed filed suit claiming that Professional Trends and Wilcox breached the buy-sell agreement and seeking specific performance of the agreement to sell Professional Trends and an injunction. Mid-Delta also sued Breaux in tort because he was complicit in the cashing of the deposit check and for his failure to clear the encumbrances. Plaintiffs also named Privitor,

14

Newman, Jones, Mullenix and Watson as necessary or indispensable party defendants because they asserted ownership interests in the company.

Professional Trends and Wilcox filed a counter claim asserting that Mid-Delta breached the consulting agreement by failing to properly bill for services.

Watson and Privitor filed counter/cross claims to have their respective interests recognized. Privitor voluntarily dismissed his cross-claim and plaintiffs voluntarily dismissed their claim against him as well.

After suit was filed, Mid-Delta obtained the interests of Jones and Mullenix. The claims against Newman, and Mullenix have been, on plaintiffs' motions, dismissed by this court.

<u>Law and Analysis</u>

1) <u>Mid-Delta's and Professional Trends' claims for breach of the buy-sell agreement</u>.

A.

Mid-Delta argues that Professional Trends breached the agreement by not providing good title to the company, by failing to clear the encumbrances, and by failing to appear at the closing and close the sale.

The buy-sell agreement provides in pertinent part:

3. The Seller promises and agrees to convey good, clear, and marketable title (except for a loan of approximately $75,000

owed to Ouachita Independent Bank[14]) to all the property to be sold hereunder, the same to be free of all liens and encumbrances. Full legal title and possession of said property will be delivered at closing. The Seller agrees and understands that this sale will not be consummated if it is determined by Buyer or its agents that the sale cannot be reasonably completed lawfully, within the scope of federal, state, or local regulations. The Buyer and her agents must be reasonably satisfied that the business' CON [certificate of need], provider numbers, and licenses can be effectively transferred and sold to the Buyer free of encumbrance, lien, or liabilities.

7. The Seller is to clear any encumbrances (except for a loan of approximately $75,000 owed to Ouachita Independent Bank[15]) on the property transferred and in the event that documents reflecting discharge of said encumbrances are not available at the time of sale, the money needed to effectuate such discharges shall be held by the attorneys of the Buyer and Seller in escrow pending the discharges.

---

[14]  See FN 7, supra, at page 7.

[15]  See FN 7, page 7, supra.

The evidence shows that Wilcox was attempting to perpetrate a fraud on Mid-Delta, and her co-owners and creditors from the inception of the deal.[16] Knowing full well of the existence of additional owners in the company, she failed to disclose those facts to the buyer and intentionally misrepresented the ownership,[17] asserting that she was the sole owner of the company. She also failed to disclose the numerous debts of the company,[18] including

---

[16] The contract, though governed by Mississippi law, was executed in Louisiana. Louisiana law defines fraud as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. CC. Art. 1953. All those definitions are met in this case.

[17] I accept Reed's testimony that Wilcox did not disclose the existence of the other owners. Wilcox testified that she told Reed that United Inc. was an owner. However, there is no evidence that United Inc. was ever an owner. Wilcox also testified that she didn't remember whether or not she told Reed that Privitor, Newman and Jones were owners; later in her testimony she said she did not disclose them because "they had given up their interests in emails." However, as noted above, shortly after the agreement was reached on August 9th, Wilcox contacted Newman to see what he, Privitor and Jones wanted out of the sale.
    I find Wilcox is without credibility based on my observations at trial, her failure to disclose the existence of other owners, debts and the bank lawsuit to Reed,  her instruction to her attorney not to disclose the closing or the purchase price to the other owners, her breaking  into the corporate offices and taking documents and other things (see infra, at page 25),  her lack of cooperation and obstructionist behavior during the discovery phase of this lawsuit, and her "I don't remember" answers .  In addition, Wilcox surreptitiously billed Medicare from her home in Houston and refused  to turn over the corporate bank accounts into which those deposits were being made (see infra, at page 26).

[18] Wilcox testified she didn't remember whether or not she told Reed of debts other than the Ouachita Independent Bank loan

the debt to Eija Watson of $75,000 and the United inc. debt of $179,000, among others.  Her deception goes far beyond a simple violation of a duty of good faith and fair dealing and rises to the level of actual fraud.

Wilcox also didn't tell Reed about the past due wages to the employees (except for those included in the $9,000), the bills to the office supply house for equipment, the bill from the medical supply provider, or the letters from the Louisiana unemployment office demanding past due taxes. Even after she was later sued by the bank on its debt, she did not tell the buyers about the lawsuit.

Instead, Wilcox continued to engage in a pattern of deception, asking her attorney not to tell the other owners about the closing or the proposed purchase price.

Professional Trends, acting through its president, Wilcox, breached the agreement by hiding the owners and the debts of the company.

Wilcox is liable for her role in interfering with Professional Trend's compliance with the contract.[19] Whether Wilcox

_____

and the tax lien, and the $9,000 she needed to pay the utilities etc.

[19]  In order to recover for intentional interference with contract in Louisiana, a plaintiff must prove:
1) A contract exists with the plaintiff and the corporate defendant,
2) the corporate officer's knowledge of the contract,
3) the officer's intentional inducement or causation of the

is also personally liable for the corporation, that is, whether the corporate veil should be pierced, will be determined after hearing additional evidence in the damages phase of the trial.[20]

Professional Trends also breached the buy-sell agreement by failing to clear the numerous claims on the business. The agreement is clear in placing the responsibility on the Seller, Professional Trends, to discharge the liens, encumbrances and liabilities. Wilcox was well aware of all these debts and obligations of the company before the meeting with Reed. After Kilburn learned of the ownership interests, claims and debts, he advised Professional Trends' attorney, Breaux, who made his client aware of each claim. Yet neither Wilcox nor Breaux did anything to take care of the

---

corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome,
    4) absence of justification on the part of the officer, and
    5) damages caused to the plaintiff.
See 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La., 1989).

In comparison, the elements of a claim for intentional interference with contract under Mississippi law are: (1) intentional and willful acts, (2) calculated to cause damage to the plaintiff in his lawful business, (3) done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice), and (4) resulting in actual damage or loss. Bryant v. Mississippi Military Dept., 519 F.Supp.2d 622 (S.D. Miss. 2007).

[20]  Evidence in this phase of the trial and in prior hearings has shown that Wilcox may have used corporate funds for her personal benefit and may have otherwise co-mingled  funds and/or used the corporation's bank account as her personal account.

encumbrances[21] by eliminating them.

It does not matter whether the other owners had legitimate claims to ownership in the company or not,[22] or whether or not the debts were owed. The claims existed and had to be dealt with before closing so that the buyers could be assured they were getting what they were paying for and that they had received all ownership interests in the company free and clear. Professional Trends, through its authorized agent, Wilcox, failed to convey "good, clear and marketable title" as required by the contract; it also failed to "clear any encumbrances," thereby breaching the agreement.[23] Despite these breaches, Mid-Delta tried to get the deal to close by repeatedly asking the Seller to clear the encumbrances.

In Mississippi, to be specifically enforceable, a contract must be "reasonably complete and reasonably definite on material points." Leach v. Tingle, 586 So.2d 799, 802 (Miss. 1991). Here the contract is both complete and definite and simply required the

---

[21]   Breaux's testimony was, essentially, that his client had not asked him to help clear the encumbrances.

[22]   It appears, however, that the ownership claims of Privitor, Newman, Jones and Mullenix were legitimate because the corporate records of the company–regardless of its name–showed that each had an ownership interest in it. The Form CMS 855 corroborates that fact as to Privitor, Newman and Jones.

[23]   Under Mississippi law,, in order to prove a breach of contract, the party asserting breach  must show: 1) the existence of a valid and binding contract,, that the other party has broken or breached its obligations under the contract, and that damage was incurred. Warwick v. Matheney, 603 So.2d 330, 336 (Miss. 1992).

seller to sell good title in Professional Trends to the buyer. Mid-Delta is entitled to specific performance of the contract to sell Professional Trends.

B.

Professional Trends argues that, in fact, Mid-Delta, Reed and Kilburn breached the agreement on October 13th by not placing the purchase price in escrow at the aborted closing at Breaux's office.[24]

First, by the time of the closing on October 13th, Wilcox had already breached the agreement by attempting a fraud on Mid-Delta and on the other owners and creditors of the company and by not clearing the encumbrances. Mid-Delta had no obligation at that time to do anything.

Second, under the express words of the agreement, escrow was required only if the encumbrances had been cleared as required by the agreement, but the documents proving their discharge were not yet available. That was not the situation here. The encumbrances had not been resolved; there were, therefore, no documents proving their resolution, no documents to receive, and escrow was not required.

Further, there was no closing. Wilcox did not show up for the closing. She was not there to sign over ownership of the company subject to any escrow. Certainly Mid-Delta had no obligation to

---

[24]   Reed and Kilburn are not parties to the contract.

complete a part of the closing (and turn over a check for $450,000) when the other party had not completed its obligations and, in fact, was not even present. Kilburn testified that Mid-Delta had come to the closing with checks to take care of the claims and was prepared to close the transaction. Reed testified that they were prepared to write separate checks to the claimants. Even the $50,000 deposit check had not been used by Wilcox to pay any of the claimants.

Nevertheless, Kilburn testified that Mid-Delta, through its attorney Mathis, offered to place all of the money in escrow but that Breaux would not "entertain that notion." The fact of that offer is admitted by Wilcox who testified that Breaux told her on the phone during the closing that Mid-Delta wanted to put all of the money into escrow and was not going to pay her anything and therefore he saw no reason for her to come to the closing.[25]

The bottom line is that Mid-Delta had no obligation under the

---

[25]   Breaux testified that he had suggested an escrow agreement and he wanted to discuss its terms, including opening a bank account. Breaux says he first suggested that $80,000 be put in escrow but quickly realized that more would be required. Breaux admitted that he doesn't remember if he ever came up with a figure to put in escrow and he admitted that he did not know the total amount of the encumbrances. He had never prepared an accounting of the debts and claims. He stated that Mid-Delta "wanted to keep the money to be sure everything was cleared up."

Breaux's testimony that he suggested an escrow is not consistent with his prior actions in ignoring the repeated requests from Mid-Delta to clear the debts and to provide an accounting. The evidence shows that Breaux had never before offered or even mentioned the possibility of an escrow.

contract or under these circumstances to place the purchase money in escrow. Because no one knew the total dollar amount of the encumbrances, escrow would have required that the entire purchase price be escrowed, something Wilcox was unwilling to agree to and the reason she turned around and did not go to the closing.

Mid-Delta, Reed and Kilburn did not breach the agreement by failing to escrow the purchase price. Professional Trends' claim is rejected.

2) <u>Mid-Delta's and Professional Trends' claims for breach of the consulting agreement.</u>

Mid-Delta claims that Professional Trends breached the consulting agreement by failing to provide the passwords for use of the Medicare billing systems, failing to relinquish control of the Professional Trends bank accounts into which all proceeds of Medicare billings were being deposited, and failing to compensate Mid-Delta for its work under the agreement, that is, failing to allow Mid-Delta to bill and receive accounts receivable during the period of the consulting agreement.

Professional Trends and Wilcox claim that Mid-Delta breached the agreement by not billing Medicare claims.[26]

The consulting agreement provided that Mid-Delta would manage Professional Trends beginning immediately after the buy-sell

---

[26]   Professional Trends and Wilcox also claim that they were defamed by Reed and Kilburn. Those claims were not pursued at trial and will be dismissed as abandoned.

agreement was signed. It was assumed by the parties that the agreement would continue in effect until the closing.[27]

Mid-Delta began operating the business with one of Professional Trends' existing employees, Darien Van Buren. Van Buren, a former longtime employee of Wilcox at Professional Trends, testified that she is a family friend of Wilcox, a friend of Wilcox's daughter, and that she rode to and from court with Wilcox both days of trial.

In addition, Mid-Delta's employee, Tonette Mix, worked at Professional Trends' offices with Van Buren.

During its operation of the business, Mid-Delta invested its time and incurred expenses for rent, salaries, employment taxes, workers compensation premiums, a medical director whom it had not been told about by Wilcox, and other bills and expenses to the tune of, perhaps, a million dollars, according to the testimony of Kilburn. During the period of the consulting agreement, Mid-Delta was to receive all Medicare billings for the period after August 1, 2006, with Wilcox receiving those before.

---

[27] The original closing date was September 30, 2006. Wilcox testified that she intended that the consulting agreement only remain in effect until that date. However, that would not make sense; someone had to continue to run the company until the closing took place. There is no evidence that Wilcox ever asked that the consulting agreement be terminated between September 30 and the new closing date, October 13, 2006. She does claim that she eventually "wanted back in" but that testimony appears to be related to the time frame immediately before she was returned to the business in March 2008.

Billing for Medicare had to be done one of three ways: use of the Lewis software system, using direct data entry (DDE), or paper billing.  The Lewis system and DDE both required passwords to access the billing systems. Reed testified that, at first, her company was unable to bill because the charts were not organized properly for billing. Mix testified that Van Buren was billing the pre-August 2006 claims. Only Wilcox and Van Buren had the passwords necessary to use the Lewis and DDE systems.[28] However, after Van Buren took things out of the office without permission and gave them to Wilcox, she was fired. Before she left, Van Buren changed the passwords and Mid-Delta was locked out of the systems.[29] Thereafter, according to Reed, Mid-Delta could not bill except for some paper claims. Proceeds of claims that were billed went into Professional Trends' bank account which Wilcox continued to control.[30]

Because Mix sometimes noticed papers and things out of place,

---

[28] Wilcox claims that she told Mid-Delta where the passwords were, but admits she never gave them the passwords saying, vaguely, they were "in the manuals".

[29] Van Buren denies she changed the passwords. However, given her relationship to Wilcox, and apparent loyalty to her in taking things out of the office and in assisting her with the break-in of the offices and her additional assistance to Wilcox as will be discussed in this section, I do not find her testimony to be credible.

[30] Both Reed and Wilcox testified that  was the agreement, the only caveat being, as noted earlier, that Wilcox believed the agreement was to end on September 30, 2006.

Mid-Delta changed the locks on the building. Thereafter, Wilcox, her landlord Nassif, and Van Buren, with the aid of a locksmith, entered the offices and removed a computer, physician orders and other documents necessary to allow Wilcox to bill.

Van Buren then traveled to Houston and taught Wilcox how to bill Medicare. Wilcox then began billing Medicare without Professional Trends' knowledge, the proceeds of which billings, presumably, were deposited into the Professional Trends bank account over which Wilcox had sole control.

Because all the proceeds of any billings were going into the bank account Wilcox controlled, Mid-Delta did not receive payment for its work or its advancing of expenses during the period of the consulting agreement.

I find that Professional Trends breached the consulting agreement by failing to provide the passwords to the billing systems to Mid-Delta so that it could fulfill its obligations under the agreement and get paid, by failing to relinquish control over the bank account so that Mid-Delta would have money with which to operate the business and get paid, and by failing to comply with the agreement such that Mid-Delta could receive remuneration for its work.

I further find that, to the extent any billing was not done, or was done incorrectly by paper billing, it was because of Professional Trends' fault, through Wilcox, in not providing the

26

passwords and access to the bank account and in causing the person doing the only billing to which Professional Trends was entitled, billings prior to August 1, 2006, to be fired for taking documents out of the corporate offices to give to Wilcox. Mid-Delta did not breach its consulting agreement.

I therefore find in favor of Mid-Delta and against Professional Trends on mid-Delta's claim for breach of the consulting agreement. I further find against Wilcox for interfering with the contract. I find in favor of Mid-Delta and against Professional Trends on Professional Trends' counter claim for breach of the consulting agreement.  Damages will be determined in the second phase of this proceeding.

3) Mid-Delta's claim against Breaux

Mid-Delta claims that Wilcox's attorney, Breaux, is liable 1) for his negligence and fault in cashing the $50,000 deposit check in violation of the agreement which required that it not be cashed until the closing, especially after he was aware, as early as October 2, 2006, that there was a dispute between the parties as to the amount of the purchase price his client would receive, and 2) for his handling of the closing by claiming the other owners' claims were mere "allegations" and not taking any action to determine their legitimacy or to clear  them up. Breaux counters that he was not the closing attorney, but was retained by Wilcox to represent her interests and those of Professional Trends in the

transaction. He also suggests that the deposit check was not given to him in trust, but rather was a check given to his client before he was even hired by her and therefore he had no obligation to anyone other than his client to protect the funds.

Plaintiff suggests five theories as to why Breaux is liable to it:

1) conversion because Breaux deposited the check Reed gave to Wilcox when it should not have been deposited until the closing,

2) Breaux's refusal to address the issues raised by Mid-Delta or to clear the title problems,

3) Breaux's participation in Wilcox's attempt to defraud Mid-Delta

4) malpractice due to Breaux's fraud and collusion, and

5) because Mid-Delta is a third party beneficiary of Breaux's work for Wilcox.

Mid-Delta's claims that Breaux refused to clear the title or address the issues raised is foreclosed by Louisiana law. Breaux testified, essentially, that he was not authorized by his client, Wilcox, to clear the title. I further reject Mid-Delta's claim that it was a third party beneficiary of Breaux's work.

An attorney does not, in the absence of intentional tortious conduct, owe a legal duty to his client's adversary when acting in his client's behalf. Penalber v. Blount, 550 So.2d 577 (La. 1989); Montalvo v. Sondes, 637 So.2d 127 (La. 1994). Here there is no

28

evidence that Breaux did anything other than what his client authorized him to do.

Neither is there evidence of fraud or collusion by Breaux. While it is clear that Wilcox was engaged in a pattern of fraudulent conduct, the evidence does not prove that Breaux was a party to that fraud simply by failing to address Mid-Delta's issues or to clear the title. While Breaux's failure to assist in clearing the title and in providing meaningful responses to Mid-Delta's inquiries was no doubt maddening to Mid-Delta, it does not rise to an intentional tort or fraud. Mid-Delta argues, however, that the above rules do not apply in a non-litigation setting and that, in a closing, the attorney has a duty to the other party to the transaction. Here, however, Breaux was not the closing attorney but rather was Professional Trends' and Wilcox's attorney.

Next, Mid-Delta argues  that the addendum to the buy-sell contract provided that the deposit check was not to be deposited until the time of closing. Therefore, Breaux had a duty not to deposit it into his trust account and then write checks to Wilcox after he knew from Mid-Delta's October 2nd email that Mid-Delta claimed an interest in the money. It alleges that this action constituted conversion. Mid-Delta also argues that Breaux's failure to protect the funds was a violation of the Louisiana Rules of

Professional Conduct, Rule 1.15.[31]

The agreement provided:

> I Brenda Wilcox received $50,000.00 earnest money from
> Mid-Delta Health System (sic) toward the purchase of
> Professional Trends, Inc. The balance of the purchase
> price of $525,000 will be paid at closing. The remaining
> balance will be $475,000 and the check for $50,000
> earnest money will be cashed at this time.

Reed testified that her agreement with Wilcox was that the check was not to be cashed until the closing. She said Wilcox typed the one paragraph addendum, above. However, I find that a plain reading of the paragraph yields the conclusion that the check could be cashed immediately, for it provides that it can be cashed "at this time".

Ordinarily, "this" refers to the present or that nearer at hand. While I recognize that sometimes "this" is used to refer to a future state of affairs, in this case, a reading of the paragraph as a whole indicates that only the balance of $475,000 was to be paid at closing. In addition, if a deposit check is not cashed until closing, then it really serves no useful purpose. Therefore, Wilcox was not at fault for depositing the check before the closing. It

---

[31] Rule 1.15 provides in pertinent part that:
(e) When in the course of representation a lawyer is in possession of property in which two or more persons . . . claim interests, the property shall be kept separate by the lawyer until the dispute is resolved . . . .

follows, then, that Breaux did not tortiously convert the funds. And while it may be that Breaux's writing the checks after he knew the funds he held in trust were disputed was a violation of Rule 1.15, it turns out that, despite it's claim made in the October 2nd email, Mid-Delta had no rights to prevent the distribution of the funds to Wilcox and thus there is no harm to Mid-Delta caused by any violation by Breaux of  Rule 1.15.

4) <u>Claims of Eija Watson</u>.

In addition to the $75,000 in unsecured loans by Watson to Professional Trends and Wilcox discussed above, Watson also purchased  Wesley Steele's and Shirley Edwards' interests in Professional Trends.

Watson testified that Wilcox had told her of the "opportunity" to invest in Professional Trends by buying out Steele and Edwards' 25% ownership interest in the business. Wilcox told her that she was making "a lot of money", an "incredible" amount. Therefore, Watson made contact with Steele and made arrangements to buy the interest. A Share Purchase Agreement was entered into on April 10, 2006 which states that Seller (Steele and Edwards) is the "owner of record of an aggregate 25 _____ shares" of Professional Trends and agrees to sell them to Watson. A closing date was set for the next day, April 11, 2006. Watson wrote her check in the amount of $75,000 and mailed it to Wilcox. She never received any other documentation representing the purchase or her ownership of the shares. Watson

testified that her understanding was that Steele and Edwards owned 25% of the business. She never received stock certificates and never saw any documents proving Steele and Edwards' ownership interests, however.

Wilcox testified that Steele and Edwards only owned 25% of the profits for two years. Wilcox has produced no documents supporting her claim. No corporate minutes have been produced to show that Steele and Edwards had an ownership interest in the company.[32] Nor have any records from the Secretary of State been produced showing they had an ownership interest.

The Share Purchase Agreement shows that Steele and Edwards believed that they were the owners of shares in Professional Trends. That agreement, along with Watson's testimony, also proves that Watson believed she was purchasing shares in the corporation. Therefore, the $75,000 paid was not to purchase the rights to profits in Professional Trends, but rather was to purchase an interest in the business. I do not accept Wilcox's testimony that Steele and Edwards only owned a right to two years' profits in the business because I do not find Wilcox's testimony to be credible and she has produced no corporate records supporting her claim.

The question then is exactly what ownership interest did Watson buy from Steele and Edwards?  The agreement is ambiguous in that it states that "25 _____ shares" are being sold. However, the

---

[32]   However, complete corporate "books" are not in evidence.

purchase price was $75,000 which proves that they were not literally selling 25 shares of stock. Something was meant to be in that blank. The prior purchases just a few months earlier by Privitor, Newman and Jones were explained in the minutes as being a total of 2500 shares for a total price of $75,000, or $30 per share[33]. Since Watson also paid $75,000 it stands to reason that she too was buying 2500 shares in the business, not 25.

This conclusion is further supported by the fact that the very next day after Privitor, Newman and Jones bought their shares, Mullenix bought her 1000 shares for a value of $30,000, or $30 per share. The evidence further shows that the total stock outstanding in the company was 10,000 shares, based on Wilcox's testimony that Privitor's Newman's and Jones' 2500 shares was for 25% of the company. So whether the blank in the share purchase agreement was supposed to say "hundred" (as in 2500) or "percent of the", the outcome is the same: Watson bought one fourth of the company.

Whether Wilcox is personally liable to Watson, that is, whether the corporate veil should be pierced, will be determined after hearing additional evidence at the damages phase of the trial.[34]

---

[33] Those minutes, dated July 13, 2005 state that the per share price was $3,000 but that is obviously an error since the same document shows that the 2500 shares were sold for a total of $75,000 ($25,000 for each purchaser) and the purchasers' checks were for a total of $75,000.

[34]   See FN 20, page 19, supra.

Ruling

For the foregoing reasons, judgment will be entered as follows:

1) in favor of Mid-Delta and against Professional Trends ordering specific performance of the buy-sell agreement and an accounting, the price to be offset by the value of ownership claims and debts or other encumbrances of the company and by any damages that may be awarded against Professional Trends,

2) in favor of Mid-Delta and against Professional Trends awarding damages to be determined in the second phase of the trial for Professional Trends' breach of the consulting agreement,

3) in favor of Mid-Delta and against Wilcox for damages for her actions in causing Professional Trends to breach the buy-sell agreement and the consulting agreement by intentionally interfering with both,

4) denying and dismissing Professional Trends' and Wilcox's counterclaims against Mid-Delta, Reed and Kilburn for breach of the buy-sell agreement and the consulting agreement and for defamation,

5) denying and dismissing plaintiffs' claims against Breaux,

6) denying and dismissing plaintiff's claims against Jones,

7) granting Watson's counterclaim recognizing her as a creditor of the company and of Wilcox on her original $75,000 loan and as a 25% owner of Professional Trends,

8) enjoining and prohibiting Professional Trends, Wilcox, their agents and those acting in concert with them from destroying,

concealing, selling, assigning, transferring, alienating, mortgaging or otherwise obligating or encumbering  their property and assets, including, but not limited to, Louisiana license #410, their accounts, bank accounts, files, records, stock or other property, subject to further Order of this court.

At the hearing on damages the parties shall be prepared to address Wilcox's personal liability vis a vis the corporate liability.

Alexandria, Louisiana, January 8 , 2010.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE